IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ARTHUR WILLIAM DAVIS, III,

    Petitioner,

v.                                                                      Case No. 21-3129-JWB

SAM CLINE,

    Respondent.

**MEMORANDUM AND ORDER**

This matter is before the court on Petitioner's petition for a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) The petition is fully briefed (Docs. 8, 13) and ready for review. The court has reviewed those portions of the state court record which are pertinent to the issues raised in the application and finds that an evidentiary hearing is not warranted. Petitioner's petition for writ of habeas corpus is DENIED for the reasons set forth herein.

**I.    Facts**

The following facts are taken from the Kansas Court of Appeals opinion following Petitioner's direct appeal:

> After Arthur W. Davis, III [Petitioner] and Michelle Davis (Michelle) divorced in 1999; they had had an ongoing dispute over the custody of their two children. Eight years after the divorce, Davis involved their 13–year– old daughter, Brynna, and 15–year–old son, Nathan, in a plan to kill Michelle. Davis appeals from his jury convictions of attempted first degree murder, aggravated kidnapping, and contributing to a child's misconduct. We affirm.
>
> Since Davis' and Michelle's divorce, Michelle has had primary residential custody of Nathan and Brynna. Davis has had visitation rights and was ordered to pay monthly child support. In late 2006, Michelle initiated child support enforcement proceedings which resulted in Davis' wages being garnished. In June 2007, Davis filed a motion for primary custody of their children. Attached to his motion were affidavits from both children stating they wanted to live with Davis.

Michelle and Davis had vastly different parenting methods. Michelle felt strongly that Nathan and Brynna should go to public school. Davis wanted to teach them himself with the aid of the internet and refused to force the children to go to school. Michelle testified that Davis allowed the children to stay up all night and do what they wanted. Over time, Nathan grew increasingly antagonistic toward Michelle. From June 2007 until the attack on Michelle, Brynna had been seeing a therapist. By the fall of 2007, Nathan began living with Davis. In the spring of 2008, SRS initiated truancy proceedings against Nathan after which Michelle had no contact with Nathan until the court ordered a custody evaluation by Dr. Milford Dale, a licensed psychologist and attorney.

Dr. Dale's evaluation involved a joint interview with Michelle and Davis. During this interview, Dr. Dale observed that Davis was uncooperative, critical, and visibly angry with Michelle. Dr. Dale also interviewed Nathan and Brynna separately, together, and with each parent. Brynna consistently told Dr. Dale she wanted to live with Davis and Nathan.

During the evaluation process, Michelle and Davis agreed that Nathan should live with Davis. However, Michelle wanted Brynna to live with her and Davis wanted Brynna to live with him. Dr. Dale was concerned that if Brynna lived with Davis, she too would become alienated from Michelle.

In early June 2009, Dr. Dale scheduled separate appointments with Michelle and Davis to review his custody recommendations before submitting the report to the court. Dr. Dale met with Michelle on Wednesday, June 10. Dr. Dale recommended: Michelle and Davis share joint legal custody of the children, Brynna live with Michelle, Nathan live with Davis, and each child should have regular visitation with the noncustodial parent.

After they discussed the report, Dr. Dale instructed Michelle not to discuss it with the children because he had not discussed it with Davis. Davis had scheduled an appointment with Dr. Dale for 2 days later.

Davis brought the children with him when he arrived for his appointment at Dr. Dale's office to review the report. Dr. Dale was with another patient so a receptionist gave Davis the report to read. When Dr. Dale got out of his therapy session, he found Nathan reading the report to Brynna and Davis. After Dr. Dale summarized his recommendations for Davis, Davis voiced his disagreement with the report and walked out. Davis left the copy of the report which had comments written on it and parts of it crossed out. A statement indicating that Brynna had reported feeling pressure from Davis to request that she live with him was crossed out and "bullshit" was written nearby.

The events resulting in the charges against Davis occurred 3 days after Davis and the children saw Dr. Dale's report.

2

On June 16, 2009, Michelle testified that she was asleep when something woke her. She saw Nathan walking toward her bed and then she was being hit on top of her head with what she later realized was a baseball bat. Michelle eventually managed to grab Nathan and pull him onto the bed where they wrestled as Michelle struggled to shield herself from Nathan's continuing blows.

As she wrestled with Nathan, Michelle yelled for help from Brynna. Brynna came into the room, turned on the light, and told Nathan and Michelle to stop. Michelle told Nathan to let go of the bat. Nathan did not say anything and continued to struggle with Michelle. Brynna walked out of the room. When Brynna came into the room a second time, Michelle pleaded with her to call 911 because she did not want to die. Nathan responded that he did not want to go to jail and told Brynna to call Davis. Brynna left but came back again. Brynna said she did not know what to do, and she put the phone on the bed.

Michelle grabbed the phone and tried to get away from Nathan. Nathan pursued her, and they continued to struggle until Michelle got to the bathroom, locked herself in, and called 911. Michelle reported to the 911 dispatcher that Nathan had attacked and injured her. While Michelle was on the phone with the dispatcher, Davis forced his way into the locked bathroom. Michelle yelled that the police were coming and assumed that would stop Davis from trying to hurt her. Instead, Davis dragged Michelle by her arms into the hallway where he held her and repeatedly yelled at Nathan to hit her. Nathan complied by hitting her on the head with the bat. When Michelle managed to break free from Davis' grasp, she ran into the kitchen. Davis caught her, grabbed her, and held her as Nathan again hit her on the head with the bat. Michelle managed to break free from Davis' grasp by slipping out of her shirt. She ran into the yard. Nathan pursued her and hit her head again with the bat.

Covered in blood and wearing nothing but her underwear, Michelle ran down the middle of the street as Nathan pursued her. Michelle came up to a police car and was helped into the back seat by an officer. Nathan stood in front of the police car's headlights holding the bat. Michelle identified him as her assailant. As the officer was arresting Nathan, Davis approached but then walked away. The next thing Michelle remembers is being placed in an ambulance and an officer asking her whether Davis was involved, and replying that he had held her.

Another officer saw Davis walk into Michelle's house. By then, Brynna was sitting in Davis' car which was parked in front of Michelle's house. When Brynna tried to speak to the officer, Davis came out of the house, led Brynna inside the house, and instructed her not to talk to anyone. When Davis and Brynna eventually came out of the house, they refused to speak to the officers.

3

The officers eventually separated Brynna from Davis. Brynna complained of pain and was taken to the hospital. While there, Brynna told the police that Michelle attacked her; she had used the bat in self-defense.

The State charged Davis, Nathan, and Brynna with the crimes involving the attack on Michelle. A couple of weeks before Davis' trial began, the State granted Brynna immunity in exchange for her testimony against Davis and an agreement to reduce the charge against Nathan to aggravated battery. Because the charge against Nathan was still pending, Nathan invoked his Fifth Amendment rights and did not testify at Davis' trial.

Brynna testified that when she, Nathan, and Davis were talking at lunch after they left Dr. Dale's office, Davis commented that he wished they could get rid of Michelle. Brynna confirmed that by getting rid of Michelle, Davis meant that they should kill her.

The following Monday evening, Nathan and Davis arrived at Michelle's home around 5:30. Brynna met them in the driveway and they discussed details of the plan to kill Michelle with Brynna's baseball bat. In the plan, Brynna would let Nathan into the house at 1 a.m., Nathan would take Brynna's baseball bat which was in the living room by the coat rack, and Nathan would kill Michelle with it. Afterward, they would call Davis at home and he would come over to Michelle's house. They would then call the police to report that Brynna killed Michelle in self-defense after Michelle attacked her.

Brynna's description of the actual attack on Michelle pursuant to that plan largely mirrored Michelle's testimony, except that Brynna admitted that she also hit Michelle with the bat at Nathan's urging just before Michelle escaped into the bathroom. Once Davis arrived, Brynna covered her head with pillows which prevented her from seeing what was going on. However, she did hear Michelle's screams, a struggle, and Davis yelling at Nathan to "hit her." Brynna also testified she initially stuck to Davis' plan by telling the police she had acted in self-defense after Michelle attacked her, but later admitted that Michelle never attacked her. Davis' neighbor testified that the weekend before the attack, he saw Nathan hit a basketball that was in the bed of a truck several times with an aluminum baseball bat while Davis watched.

Davis challenges Michelle's memory of the events because of her head injuries and suggested that she had an ulterior motive to blame Davis. Davis questioned the thoroughness of the investigation, highlighting physical evidence that contradicted Michelle and Brynna's description of the events. Davis also testified that Brynna was solely responsible for the attack on Michelle, and that he and Nathan arrived that morning after Brynna phoned begging for help.

4

> The jury ultimately found Davis guilty as charged. Davis filed a motion for a new trial. After a hearing, the trial court denied Davis' motion and sentenced him to a controlling term of 310 months in prison.

*State v. Davis*, Case No. 103,873, 258 P.3d 387 (Table), 2011 WL 3795267, at *1–*4 (Kan. Ct. App. Aug. 26, 2011). Petitioner filed a direct appeal, and the Kansas Court of Appeals affirmed his convictions and sentence. *Id.* The Kansas Supreme Court declined review of Petitioner's appeal. (Doc. 1 at 2.) In early 2013, Petitioner filed a K.S.A. 60-1507 post-conviction relief action with the Douglas County District Court. (*Id.* at 3; Doc. 8 at 4.) Petitioner received an evidentiary hearing in the district court on some of the grounds he raised in his K.S.A. 60-1507 motion, and the district court denied his motion. (Doc. 1 at 3.) The Kansas Court of Appeals affirmed the denial of Petitioner's K.S.A. 60-1507 motion in May 2021. *Davis v. State*, Case No. 121,858, 485 P.3d 1207 (Table), 2021 WL 1825684 (Kan. Ct. App. 2021). Shortly after the Kansas Court of Appeals decision, Petitioner filed this petition for a writ of habeas corpus. (*See* Doc. 1, filed May 24, 2021.)

## II. Standard

Habeas petitions are governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Hooks v. Ward*, 184 F.3d 1206, 1213 (10th Cir. 1999). A federal court shall not grant a writ of habeas corpus unless the state's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2). A "decision is 'contrary to' a clearly established law if it applies a rule different from the governing law set forth in Supreme Court cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts." *Underwood v. Royal*, 894 F.3d 1154, 1162 (10th Cir. 2018)

(quoting *Lockett v. Trammel*, 711 F.3d 1218, 1231 (10th Cir. 2013)). A "decision is an 'unreasonable application' of clearly established federal law if it identifies the correct governing legal principle … but unreasonably applies that principle to the facts of petitioner's case." *Id.* (quoting *Lockett*, 711 F.3d at 1231).

An unreasonable application of federal law is a higher bar than even an incorrect or erroneous application of federal law. *Wood v. Carpenter*, 907 F.3d 1279, 1289 (10th Cir. 2018) ("Even a clearly erroneous application of federal law is not objectively unreasonable. . . . Rather, a state court's application of federal law is only unreasonable if all fairminded jurists would agree the state court decision was incorrect.") (alterations and quotations omitted)).

"[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner's burden is to rebut this presumption by clear and convincing evidence. *Id.* A reviewing federal court is bound by the state court's interpretation of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

**III.    Analysis**

In his petition for a writ of habeas corpus, Petitioner argues that he had ineffective assistance of counsel before and during his trial. (Doc. 1.) More specifically, Petitioner argues that his trial counsel, Greg Robinson: (1) confused the terms "premeditation" and "overt act" related to the charge of Attempted First Degree Murder; (2) did not explain the element of "premeditation" to Petitioner; (3) failed to investigate and present evidence to rebut Brynna's testimony; (4) failed to investigate and present evidence of Petitioner's alibi; and (5) did not object

to the charging document which was allegedly deficient. (Doc. 1 at 6.)[1] Petitioner additionally argues that there was insufficient evidence to support his convictions because the record fails to show that Petitioner and his children shared the same specific intent. (Doc. 1 at 9–10.) Last, Petitioner argues that his sentence fails to conform to state law and that he should have been sentenced for domestic battery rather than attempted first degree murder because the victim was his ex-wife. (Doc. 1 at 11–12.) The government disputes each of these arguments. (Doc. 8.) The court will address these arguments in turn.

### A. Ineffective Assistance of Counsel

The federal right at issue is the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The state court properly identified this right, utilizing the *Strickland* standard set forth below. *Davis*, 2021 WL 1825684, at *4. In his traverse, Petitioner argues that the correct standard to apply here is not the *Strickland* standard but the standard set forth in *United States v. Cronic*, 466 U.S. 648, 659–60 (1984). (Doc. 13 at 8–9.) The *Cronic* standard includes a presumption of prejudice and is appropriate "only when a defendant is completely denied the assistance of counsel or denied counsel 'at a critical stage of the proceeding.'" *Sola-Morales v. State*, 300 Kan. 875, 883, 335 P.3d 1162, 1169 (2014) (quoting *State v. Galaviz*, 296 Kan. 168, 181, 291 P.3d 62 (2012)). Under *Cronic*, a defendant does not have to show that the result would have been different but for the conduct of the attorney. *Id.* This court disagrees with Petitioner. *Cronic* is appropriate only in extreme cases in which a defendant is denied the assistance of counsel, and that is not the case here.[2] The court concludes that the

---

[1] Petitioner numbered the pages of his Petition as they relate to certain sections of the habeas petition form. (Doc. 1.) For example, the sixth page of the document is labeled as "Page 6(a) #1" and the seventh page of the document is labeled as "Page 6(a) #2." (*Id.*) For ease of reference, the court refers to the page numbers as the page number of the actual document. Accordingly, Doc. 1 at 6 refers to the sixth page of the document.

[2] Petitioner likens Robinson's failure to remember certain details "to the conduct of counsel who sleeps through critical stages of the proceedings." (Doc. 13 at 5.) But Petitioner presents no evidence that Robinson's memory failed him

state court's decision was not contrary to federal law because the state court identified the correct legal standard, and Petitioner failed to identify a Supreme Court case decided differently on materially indistinguishable facts.

To successfully show ineffective assistance of counsel, "a defendant must prove both that: (1) his attorney's 'representation fell below an objective standard of reasonableness,' and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *United States v. Maley*, 1 F.4th 816, 820 (10th Cir. 2021) (quoting *Strickland*, 466 U.S. at 687–88, 694).

Petitioner raises multiple arguments as to why his counsel was ineffective. (Doc. 1 at 6.) The state court addressed these arguments under the *Strickland* standard and determined Petitioner had not raised a valid claim. *Davis*, 2021 WL 1825684, at \*4–\*10. The questions presented here are whether the state court's decision was based on an unreasonable application of *Strickland* and whether that decision was based on an unreasonable determination of the facts in light of the evidence presented.

### i.   Did counsel confuse "premeditation" with "overt act"?

Petitioner argues that Robinson confused the terms "premeditation" and "overt act," causing him to use the "general denial" strategy which was unsuccessful because this was an aiding and abetting case. (Doc. 1 at 7–8.) The government contends that it was clear at the evidentiary hearing that Robinson understood what was required to show premeditation and mounted an unsuccessful defense against it. (Doc. 8 at 14.)

This same argument was presented to the Kansas Court of Appeals in Petitioner's K.S.A. 60-1507 appeal. *See Davis*, 2021 WL 1825684, at \*8. The court determined that Robinson

---

at the trial or before – Robinson simply cannot remember in detail about this trial eight years later. The court will not fault him for that.

understood the element of premeditation and the requirements to prove premeditation. *Id.* Additionally, the court noted that Robinson "was aware of, and argued against, the aiding and abetting portion of the charges." *Id.* at *5.

Robinson testified extensively before the district court in Douglas County regarding Petitioner's K.S.A. 60-1507 claim. (Mot. Hr'g vol. 1, 15–117, 139–99, Oct. 4, 2017.) In particular, Robinson was questioned about his knowledge of premeditation. (*Id.* at 32–39.) In explaining his own knowledge of premeditation, Robinson provided an example he uses to explain it to his clients. (*Id.* at 33–34.) Based on this testimony, it is clear that Robinson understood the term "premeditation" and knew what the state was required to prove. Thus, Robinson's representation did not fall below the objective standard of reasonableness.

The court finds that the state court's findings did not involve an unreasonable application of *Strickland*, nor were the factual findings unreasonable in light of the evidence presented.

   ii.  Did counsel explain premeditation to Petitioner?

Petitioner argues that Robinson never explained the concept of premeditation to him and that if his counsel had explained premeditation to him, Petitioner would have produced evidence of an alibi defense. (Doc. 1 at 6.) The government contends that Robinson explained premeditation to him. (Doc. 8 at 15.) The state court found that there was evidence to show that Robinson explained premeditation to Petitioner. *Davis*, 2021 WL 1825684, at *5.

Petitioner testified at the evidentiary hearing for his K.S.A. 60-1507 motion that Robinson never explained the concept of premeditation to him. (Mot. Hr'g vol. 1 at 250–51, Oct. 4, 2017.) Petitioner's strategy at the evidentiary hearing was general denial,[3] as he denied ever seeing the

---

[3] Unfortunately for Petitioner, this was a poor strategy choice, as much of his testimony was easily contradicted by the record. (Mot. Hr'g vol. 2 at 319–21, 334–35, Jan. 17, 2018.) In fact, after twice being confronted with records that contradicted Petitioner's testimony (*id.*), Petitioner changed his tactic – when the government asked him if it

9

charging document prior to trial, denied knowing what he had been charged with, denied ever discussing defense strategy with his counsel, and even denied knowing when his trial would occur. (Mot. Hr'g vol. 1 at 245–69, Oct. 4, 2017.)

Robinson also testified regarding his representation of Petitioner at the trial phase. Although he did not have a specific memory of telling Petitioner about premeditation,[4] Robinson explained that he would generally explain the charges against a client and what the state would have to prove in order to carry its burden. (*Id.* at 32–34.) As mentioned above, Robinson also testified about an example he uses to explain premeditation to his clients. (*Id.* at 33–34.)

This court agrees that there was substantial evidence showing Robinson explained premeditation to Petitioner. Petitioner has not shown that the state court's factual determination was unreasonable in light of the evidence presented, nor that the state court's decision based on those factual determinations was an unreasonable application of *Strickland*.

      iii.    *Did counsel fail to investigate Brynna's immunity deal and present evidence to rebut Brynna's testimony?*

Petitioner's argument on this point is somewhat unclear but it appears that Petitioner is asserting that his counsel should have more thoroughly investigated the circumstances behind Brynna's immunity deal and Nathan's plea deal to discredit Brynna's testimony. (Doc. 1 at 8.) The government seems to confuse this argument with Petitioner's next argument regarding his alibi, which is understandable as Petitioner's arguments, presented pro se, are not a model of clarity. (Doc. 8 at 15–17.)

---

would refresh his memory to look at a record or transcript, Petitioner answered several times that it would not. (*Id.* at 336–37, 338, 339.)

[4] Robinson's case file, including any handwritten notes he took, was provided to one of Petitioner's other attorneys at some point in the pendency of the case. (Mot. Hr'g vol. 1 at 19–21, Oct. 4, 2017.) This meant that Robinson had to rely on only his own memory of the case when he testified at the evidentiary hearing roughly eight years after the trial. (*Id.*) Accordingly, while Robinson at times did not remember certain details, he was able to testify to the normal routine he had developed with clients over the course of his career.

The Kansas Court of Appeals, however, briefly addressed this argument: "Robinson argued that Brynna's testimony – a crucial portion of proving the plan existed – was 'purchased.'" *Davis*, 2021 WL 1825684 at *5. Robinson could not have made this argument without making at least some investigation of Brynna's immunity agreement. Robinson tried to impeach Brynna's credibility on cross-examination with regard to statements she made before and after she had counsel and the inconsistencies between those statements. (Mot. Hr'g vol. 1 at 158–59, Oct. 4, 2017.) And Robinson requested a copy of Brynna's immunity deal before trial. (*Id.* at 168.)

During the K.S.A. 60-1507 evidentiary hearing, Petitioner's counsel[5] suggested that Brynna not only negotiated immunity for herself, but also negotiated a plea deal on behalf of Nathan based on her testimony at trial. (*Id.* at 167–69.) Record evidence shows that Nathan did not enter into his plea agreement until after Petitioner's trial ended. (*Id.* at 178–79.) Robinson explained that he never would have relied on Nathan's testimony because Nathan's case was not done. (*Id.*) And although it bothered Robinson that Nathan was not available to testify because it made it more difficult to confront or check Brynna's testimony (*id.* at 180), Robinson still planned and presented Petitioner's defense. (*Id.* at 190–91.) Robinson also was not overly concerned that Nathan was not offered immunity because Nathan was not his client, Petitioner was. (*Id.* at 180.)

Further, although Nathan was not available as a witness to confront Brynna's testimony, Petitioner himself testified at trial. *See Davis*, 2021 WL 1825684 at *10. Petitioner "refuted his daughter's claims about the Monday evening meeting." *Id.* Petitioner had the opportunity to confront Brynna's testimony and mount a defense against it. Considering this evidence, the state court's finding was not an unreasonable application of *Strickland*, nor was it an unreasonable determination of the facts.

---

[5] Petitioner was represented by Stacey Schlimmer and Angela Keck at the K.S.A. 60-1507 stage. (Mot. Hr'g vol. 1 at 2, Oct. 4, 2017.) Petitioner now continues his efforts pro se.

11

      *iv.*  *Did counsel fail to investigate and present Petitioner's alibi?*

On this point, Petitioner argues that his counsel failed to investigate and present alibi witnesses who could testify that Petitioner could not have planned the murder on Monday evening because he was teaching a tai chi class. (Doc. 1 at 6.) The government contends that the testimony of the supposed alibi witnesses, Gail Underwood and Donald Dorsey, was unreliable and unpersuasive. (Doc. 8 at 16–18.) Additionally, the government points to evidence of several different meetings at which Petitioner, Nathan, and Brynna discussed their plan, noting that the evidence related to Petitioner's alibi for one of those meetings would not have changed the outcome. (*Id.* at 17.) The state court briefly addressed this issue, reiterating that the district court found the alibi evidence not credible and the evidence of guilt overwhelming. *Davis*, 2021 WL 1825684, at *6.

The court agrees with the government. As Robinson testified at the evidentiary hearing, this Monday evening meeting was not the "death knell" of the state's case. (Mot. Hr'g vol. 1 at 199, Oct. 4, 2017.) Robinson recalled that after Brynna was granted immunity, Brynna testified about a dinner after a meeting with the psychologist where the initial plan was formed. (*Id.* at 66–68.) Petitioner never disputed that this dinner occurred or that he had an alibi for the dinner. (*Id.* at 151, 154; Mot. Hr'g vol. 2 at 313, Jan. 17, 2018.) Petitioner disputed that they discussed murder at the dinner. (Mot. Hr'g vol. 2 at 313, Jan. 17, 2018.) But considering the evidence in the light most favorable to the prosecution, the plan was formed at this dinner. Accordingly, the state court's determination on this point was not an unreasonable application of *Strickland* and was not unreasonable in light of the evidence.

      *v.*  *Did counsel fail to object to the allegedly deficient charging document?*

Petitioner argues that his counsel should have objected to the charging document because it omitted an essential element of the offense (premeditation) and only provided the elements of attempt and the name of the offense attempted (first degree murder). (Doc. 1 at 9.)  Petitioner also argues that "the evidence introduced at [Petitioner's] trial to show commission of the crime sought to have been charged and the jury instructions thereon have no bearing on the missing element." (*Id.*)  The government counters Petitioner's argument, explaining that the Kansas Court of Appeals considered this question and found Petitioner's arguments unavailing. (Doc. 8 at 18–19.)

Petitioner has a federal right to effective assistance of counsel, as noted above. *Strickland*, 466 U.S. at 687.  Petitioner also has a federal due process right to be informed of the charges against him, although he does not identify this right in his argument. *Id.* at 685.  The state court properly identified Petitioner's right to effective assistance of counsel and the standard for making an ineffective assistance of counsel claim. *Davis*, 2021 WL 1825684, at *4.

The Kansas Court of Appeals considered this argument, addressing whether Petitioner had a claim for ineffective assistance of counsel related to the charging document. *Davis*, 2021 WL 1825684, at *8.  The court concluded that even if the charging document was deficient, the district court had jurisdiction. *Id.* (citing *State v. Dunn*, 304 Kan. 773, 811, 375 P.3d 332 (2016)).  The court went on to explain that "[e]ven if the charging document was deficient for not referring to premeditation, [Petitioner] and Robinson had all the necessary information with which to mount a defense, and Robinson did so, albeit unsuccessfully in the face of the compelling evidence presented by the State." *Davis*, 2021 WL 1825684, at *8.

Under Kansas law, a charging document must state facts which, if proven beyond a reasonable doubt, establish that a crime was committed. *State v. Rodriguez*, 305 Kan. 1139, 1145–46, 390 P.3d 903, 909–10 (2017) ("Under the new test from *Dunn*, the question becomes whether

13

proof of those charging document factual allegations would produce sufficient evidence from which a rational jury could find, beyond a reasonable doubt, that Rodriguez committed the crime of kidnapping as it is defined by statute."). Even if a charging document is deficient, the reviewing court looks to whether the defect affected the defendant's substantial rights under a harmless error standard. *Id.*

> The amended information for the attempted first degree murder charge stated:
>
> That on or about the 16th day of June 2009, in Douglas County, Kansas one Arthur W. Davis, III, did then and there unlawfully and feloniously commit an overt act, to wit: struck Michelle Davis repeatedly with baseball bat, toward the perpetration of the crime of Murder in the First Degree, as defined by K.S.A. 21-3401(a) with the intent to commit said crime but failed in the perpetration thereof or was prevented or intercepted in executing said crime, all in violation of K.S.A. 21-3301. (Attempted Murder in the First Degree, Level 1/Person/Felony).

*Davis*, 2021 WL 1825684, at *8. Petitioner contends that this charging document was deficient and that his counsel should have objected to it because it did not contain an essential element of the offense, premeditation. (Doc. 1 at 9.) But under Kansas law, the charging document need not set out the elements of the crime; it need only set out facts which if proven beyond a reasonable doubt would allow a jury to conclude that the crime was committed. At the time of Petitioner's trial, the elements of the crime were: (1) that Petitioner performed an overt act toward the commission of first degree murder; (2) that Petitioner did so with intent to commit first degree murder; (3) that Petitioner failed to complete the commission of first degree murder; and (4) that Petitioner did so on or about June 16, 2009 in Douglas County, Kansas. (Jury Instr. No. 7.) The elements of first degree murder were: (1) that Petitioner intentionally killed Michelle; (2) that Petitioner committed the killing with premeditation; and (3) that Petitioner committed this act on or about June 16, 2009 in Douglas County, Kansas. (*Id.*)

14

The state court analyzed the issue by jumping to the second prong of the inquiry, whether any defect affected Petitioner's substantial rights under a harmless error standard. *Davis*, 2021 WL 1825684, at *8. It did not determine whether the charging document was, in fact, deficient for not referring to premeditation. *See id.*

Robinson testified that he knew, based on his experience, that attempted murder in the first degree would require premeditation even if the charging document did not say the word "premeditation." (Mot. Hr'g vol. 1 at 34–35, Oct. 4, 2017.) And Robinson established a defense strategy, general denial, based on what the State was alleging. (*Id.* at 39.) Accordingly, even if the charging document was deficient, the state court correctly concluded Robinson knew what the allegations were and established a defense to the allegations. *Davis*, 2021 WL 1825684, at *8. The court finds that this was not an unreasonable application of *Strickland* nor was it an unreasonable determination of the facts in light of the evidence presented.

   *vi.*  *Conclusion*

Based on the above analysis, Petitioner has failed to establish that the state court decisions rejecting his claim of ineffective assistance of counsel were contrary to, or involved an unreasonable application of federal law or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

  **B. Insufficient Evidence**

Petitioner argues that there is insufficient evidence to uphold his convictions for both attempted first degree murder and aggravated kidnapping because there was no evidence presented to show that he, Nathan, and Brynna all shared the same specific intent to kill Michelle. (Doc. 1 at 10.) The government argues there was sufficient evidence. (Doc. 8 at 20.)

The federal right at issue is the due process right not to be convicted except when there is proof beyond a reasonable doubt of facts to establish guilt. *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). Although the state court did not specifically identify this standard, it did consider the evidence against Petitioner to determine whether it was sufficient. *See Davis*, 2021 WL 1825684, at *9–*10, *13. State courts are not required to identify the correct standard under federal law, so long as "neither the reasoning nor result of the state-court decision contradicts" clearly established federal law. *Early v. Packer*, 537 U.S. 3, 8 (2002).

"[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" *Jackson*, 443 U.S. at 319 (emphasis in original). "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Id.* (emphasis in original).

Petitioner only questions the sufficiency of evidence related to his specific intent and whether he and his children shared the same specific intent. (Doc. 1 at 10.) Petitioner and his children were required to share the same specific intent for the underlying crimes (aggravated kidnapping and attempted first degree murder) because Petitioner was convicted on an aiding and abetting theory. *Davis*, 2021 WL 1825684, at *5 ("In order to prove that Davis was guilty of attempted first-degree murder under an aiding and abetting theory, the State was required to prove that Davis premeditated the crime and aided his son in its commission.") (citing K.S.A. 2020 Supp. 21-5402(a)(1); K.S.A. 2020 Supp. 21-5210(a)); *see also State v. Overstreet*, 288 Kan. 1, 11, 200 P.3d 427, 435 (2009) ("the State was required to prove that the defendant shared in the specific

intent of premeditation and thus promoted or assisted in the commission of the specific crime of premeditated first-degree murder.").

Beginning with Petitioner's conviction for aggravated kidnapping, the State was required to prove "that a taking occurred with intent to terrorize or commit bodily injury on Michelle." *Davis*, 2011 WL 3795267 at *9. There was evidence at trial that Petitioner broke down the locked bathroom door Michelle was hiding behind, dragged her into a hallway, and held her down while yelling at Nathan to hit her. *Id.* When Michelle escaped into the kitchen, Petitioner again caught up to her and held her down while Nathan hit her. *Id.* This evidence is sufficient to show that Petitioner and Nathan shared the specific intent to commit bodily injury on Michelle.

Next, the court considers the evidence against Petitioner related to attempted first degree murder. "[T]he State was required to prove that Davis premeditated the crime [of murder in the first degree] and aided his son in its commission." *See Davis*, 2021 WL 1825684 at *5 (citing K.S.A. 2020 Supp. 21-5402(a)(1); K.S.A. 2020 Supp. 21-5210(a)).

There is evidence in the record that shows Nathan, Brynna, and Petitioner discussed and came to a plan to attack and kill Michelle. *See Davis*, 2011 WL 3795267, at *2–*3. Brynna testified that they talked about the specific plan, and the attack appears to have unfolded much like that plan. *See id.* A neighbor also testified that he saw Nathan beating a basketball with a baseball bat the weekend before the attack while Petitioner watched. *Id.*

Considering this evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements beyond a reasonable doubt. There is evidence that Brynna, Nathan, and Petitioner deliberated on and came to a plan through several conversations. There is also evidence that they prepared to execute the plan, as Nathan appeared to be practicing for the attack shortly before it happened. Petitioner's arguments on this point fail. There was no

unreasonable determination of the facts, and the decision was not contrary to or an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d).

### C. Illegal Sentence

Petitioner argues that his sentence is illegal under Kansas law because he should have been sentenced for the more specific crime of domestic battery. (Doc. 1 at 11.) The government argues that this court cannot consider this argument because it involves an allegation that a state court did not comply with state statutes. (Doc. 8 at 26.) Petitioner argues in his traverse that it is appropriate for the federal court to consider this argument because the state law decision is so unfair it implicates federal due process concerns. (Doc. 13 at 22–23.)

The court agrees that it is inappropriate for a federal court to consider the issue because Petitioner fails to identify a federal issue nor does the court see a federal issue. Accordingly, the court declines to consider the issue.

### IV. Conclusion

For all the reasons stated above, Petitioner's application for a writ of habeas corpus (Doc. 1) is DENIED.

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Pursuant to 28 U.S.C. § 2253, this court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court must indicate "which specific issue or issues satisfy the showing." This requires Petitioner to show that this court's ruling was "debatable among reasonable jurists." *Harris v. Sharp*, No. 17-6109, 2019 WL 5541416, at *37 (10th Cir. Oct. 28, 2019) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003)).

The court finds that a certificate of appealability should not issue in this case.  Nothing in the record suggests that the Tenth Circuit would resolve these issues differently.

IT IS SO ORDERED this 20th day of October, 2022.


                                                                     \_s/ John W. Broomes_____
                                                                     JOHN W. BROOMES
                                                                     UNITED STATES DISTRICT JUDGE